**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 17-51 (BAH) |
| RAUL FLORES-HERNANDEZ, | Judge Beryl A. Howell |
| Defendant. | ***EX PARTE & UNDER SEAL*** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant Raul Flores-Hernandez pled guilty, on March 8, 2023, without a plea agreement, to the single charge against him of conspiring, from "in or around 1983 and continuing to the date of the filing of this Indictment" on March 8, 2017, Indictment, ECF No. 1, to distribute five kilograms or more of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), and 963, and admitted at the plea hearing to his participation in the charged conspiracy, "from in or about 2007, within the countries of Bolivia, Peru, Brazil and Mexico," and his accountability for "more than 150 kilograms but not more than 450 kilograms" of cocaine. Def.'s Statement of Facts ¶¶ 1, 2, ECF No. 29. At the sentencing hearing scheduled for September 6, 2023, the government intends to present evidence supporting various disputed sentencing enhancements, including that: (1) defendant is accountable for 450 or more kilograms of cocaine, warranting a base offense level of 38, under the applicable advisory guidelines, U.S.S.G. §§2D1.1(a)(5) and (c)(1); (2) defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, warranting a four-level upward adjustment, under *id.* § 3B1.1(a); (3) defendant imported or exported a controlled substance using an aircraft, warranting

1

a two-level increase, under *id*. § 2D1.1(b)(3)(B); and (4) defendant bribed or attempted to bribe a law enforcement officer to facilitate the commission of the offense, warranting a two-level increase, under *id*. §2D1.1(b)(11).  *See* Presentence Report ("PSR") ¶ 4, ECF No. 41; *see also* Def.'s Objections to Draft PSR, ECF No. 44 (noting defendant's objections to all the foregoing guidelines determinations).

In connection with the sentencing hearing, the government has moved, *ex parte* and under seal, for authorization to withhold from defendant three law enforcement reports, which have not been disclosed to the Court and are minimally described as relating to a government witness's ("the Witness") mental health condition, treatment for that condition and the government's role in facilitating the Witness's access to and obtaining that treatment.  *See* Gov't Mot. for Prot. Order ("Gov't Mot.") at 1, ECF No. 45.  The Witness is anticipated to testify at the sentencing hearing to provide factual support for the government's position on appropriate application of the sentencing enhancements under the guidelines.  Instead of producing the three withheld law enforcement reports, the government seeks to disclose, in accordance with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), only the following single statement related to these reports that omits any reference to the Witness's mental health: "On one occasion, FBI assisted the Witness by retrieving the Witness's vehicle and facilitating its return to the Witness's wife because the Witness was unable to retrieve it himself."  *Id.* at 3–4.

For the reasons explained more fully below, the government's proposed disclosure falls short of capturing the relevant information apparently available in the reports subject to disclosure under *Brady* and *Giglio*.  Based on the government's description, the reports not only detail the FBI's and law enforcement's involvement in obtaining treatment for the Witness,

which sheds light on the nature of the Witness's, and his family's, relationship with the government and represents an instance of the Witness receiving benefits from the government, but also contain information regarding the Witness's mental state at the time key events may have occurred, both of which have a bearing on his credibility.  Defendant is therefore entitled to see these reports, and the government's motion is denied.

## I.   BACKGROUND

The government intends to call the Witness "to testify as to the Defendant's narcotics and money laundering activities from the early 1980s through approximately 2012."  Gov't Mot. at 2.  According to the government, the Witness's family and defendant's family were "close socially" at the time of defendant's drug trafficking activities, "with the Witness's father being godfather to at least one of the Defendant's sons."  *Id.*  Prior to 2012, when the Witness turned himself in to the U.S. Drug Enforcement Administration and began cooperating, he was also involved personally in drug trafficking and money laundering activities in coordination with defendant beginning in 2003.  *Id.* at 2–3.  In short, the Witness appears poised to offer key testimony at sentencing regarding the precise nature and extent of defendant's illicit activities during close to a decade of the charged conspiracy period, including during the time-frame defendant admitted at the plea hearing to being involved.

As noted, the government seeks to withhold from disclosure three law enforcement reports detailing the following events, as summarized in the government's motion: On June 19, 2019, the FBI "received information regarding the Witness's safety," and arranged for local law enforcement to respond.  *Id.* at 3.  Local law enforcement met with the Witness, who said "he wanted to die," prompting officers to take him to a behavioral health facility for evaluation.  *Id.* While the Witness was still at the facility, the local FBI agents met with him, and discussed his

3

depression and that the Witness "had felt this way once before, when he was in Panama," which reference to Panama, the government explains in a footnote, occurred after the Witness was released from being kidnapped and held hostage for almost two months in 2010. *Id.* & n.1 (noting that "Witness's statements relating to this kidnapping incident and the Witness's subsequent flight to Panama [will be disclosed] as part of [government's] disclosures pursuant to the Jencks Act, 18 U.S.C. § 3500 *et seq.*"). The Witness was in the behavioral health facility for "a short period of time" before being released. *Id.* While he was there, the FBI arranged for the return of the Witness's vehicle to his wife. *Id.*

## II.   DISCUSSION

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. "Further, in *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court extended the prosecution's *Brady* obligation to include the disclosure of evidence affecting the credibility of a witness." *United States v. Celis*, 608 F.3d 818, 834 (D.C. Cir. 2010). Evidence is considered "material" if it is reasonably probable that, had the evidence been disclosed to the defense, the result of the proceeding would be different. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Wearry v. Cain*, 577 U.S. 385, 392 (2016) (per curiam) ("Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" (quoting *Giglio*, 405 U.S. at 154)). "Evidence may be material even when it affects only the credibility of a witness." *United States v. Herrera*, 51 F.4th 1226, 1242 (10th Cir. 2022); *see also Kyles v. Whitley*, 514 U.S. 419, 434, 454 (1995) (applying *Bagley* to find that witness statements

4

suggesting inconsistencies in eyewitness accounts could not be suppressed because they could have led a jury to find the eyewitnesses unreliable).

Of course, assessing materiality under these standards assumes a *post hoc* perspective on the totality of the evidence presented at trial; only then can a court meaningfully address whether the outcome of a proceeding would have been different had certain disclosures been made.  Here, by contrast, the government seeks assurance prior to any proceeding that their desired non-disclosures will not later present a *Brady*/*Giglio* problem.  Addressing that question in this posture necessarily invites speculation as to the relevancy and probative value of the evidence at issue, when neither the Court nor the government yet knows how the defense plans to present its case.  Caution is therefore of particular importance at this stage—if the law enforcement reports have the *potential* to serve as impeachment material, better to recognize that potential now than tempt the commission of *Brady*/*Giglio* errors because certain assumptions about the defense's plans turn out to be unfounded.  *See, e.g.*, *Bagley*, 473 U.S. at 700–05 & n.5 (Marshall, J., dissenting) (explaining the perversity of "apply[ing] the 'materiality' standard at the pretrial stage" to make nondisclosure determinations and recommending that because "[n]o prosecutor can know prior to trial whether such evidence *will* be of consequence at trial . . . the mere fact that it might be . . . suffices to mandate disclosure" (emphasis in the original)).

Set against these standards, distillation into the single proposed statement of partial information apparently contained in the three withheld law enforcement reports is insufficient to comply with the government's *Brady* and *Giglio* obligations for two reasons.

First, where, as here, the government has promised or provided benefits to a witness, evidence related to such benefits must be disclosed to the defense due to the reasonable probability that such benefits may affect the witness's credibility.  *See Bagley*, 473 U.S. at 684

(holding that nondisclosure of government promise of benefits to two principal witnesses in the form of contracts to pay money commensurate with the information furnished, had the "natural effect" of misleading the defense that the two witnesses provided inculpatory information without any "inducements," when the contracts made reasonably probable that the government had incentivized them to do so); *Giglio*, 405 U.S. at 152–55 (holding that a promise from an individual prosecutor that a witness would not be prosecuted if he testified was relevant to witness's credibility).  Acknowledging this well-settled law, the government's proposed statement would disclose to defendant that a specific benefit was conferred on the Witness when "the FBI assisted the Witness by retrieving the Witness's vehicle and facilitating its return to the Witness's wife."  Gov't's Mot. at 3–4.

So far so good, but by stripping away the context in which the FBI furnished car-valet service for Witness's wife, this single sentence is misleading in three ways: by underplaying the potentially dependent relationship the Witness (and his family) have with the FBI, omitting any reference to the seriousness of the mental health crisis suffered by the Witness both in 2019 and 2010, and minimizing the gratitude the Witness may have for the attention and assistance provided to him and his family in this crisis.  Indeed, the single proposed statement fails to disclose that: (1) when the Witness suffered a medical crisis, the FBI apparently was the first call made for help; (2) when alerted, the FBI, to its credit, sprang into action to assist the Witness with receiving critical mental health treatment—not restoring the Witness's car to his spouse— by alerting the local FBI office, where the Witness resided; (3) the local FBI office then arranged for local law enforcement to respond and transport the Witness to a health facility; and (4) local FBI agents followed up and met with the Witness in the health facility to interview him. Only

6

after these other steps were taken, did the local FBI office facilitate the return of the Witness's car to his spouse.

This fuller context of the Witness's receipt of benefits from the government when the FBI coordinated with the local FBI office and local law enforcement to send him to a facility for mental health evaluation and treatment is important information in assessing the Witness's incentives or biases to testify favorably to the government.  *See United States v. Abel*, 469 U.S. 45, 51–52 (1984) ("A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony," where "[b]ias is a term used . . . to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.").  Just as the withholding of the contractual arrangements in *Bagley* misled the defense regarding the witnesses' bias, the proposed *Giglio* disclosure here—which mentions only the FBI's retrieval and delivery of the Witness's car—could reasonably mislead the defense that the government's assistance was trivial to the Witness, when in fact its assistance in obtaining mental health evaluation, admission, and treatment for the Witness may have been a matter of life and death.  The fact that the FBI was apparently the first point of contact when the Witness experienced this mental health emergency further indicates a dependent relationship between the Witness and his family with the government, and may provide a source of bias and partiality favoring the government that defendant is entitled to explore.

Second, the government asserts that withholding the three law enforcement reports is appropriate as the reports are neither "relevant nor . . . helpful to the defense" because "suicidal ideation or depression by itself would not cause the Witness to have 'difficulty in perceiving

reality or motivate' him to testify against the Defendant," Gov't's Mot. at 4 (quoting *United States v. George*, 532 F.3d 933, 937 (D.C. Cir. 2008), and "because the incident took place in 2019, approximately four years prior to his anticipated testimony," *id*.  At the same time, the government acknowledges, correctly, that evidence regarding a witness's mental health may qualify as material *Giglio* evidence when such evidence "reasonably cast[s] doubt on the ability or willingness of a witness to tell the truth."  *Id*. (quoting *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) and citing *George*, 532 F.3d at 936–37).  Indeed, courts across the country regularly conclude that evidence regarding a key witness's mental health may be used to attack that witness's credibility, triggering disclosure obligations under *Brady* and *Giglio*.  *See, e.g.*, *Fuentes v. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016) ("Based on clearly established fundamental rights and principles, we think it indisputable that if the prosecution has a witness's psychiatric records that are favorable to the accused because they provide material for impeachment, those records fall within *Brady* principles[.]"); *Hall v. Mays*, 7 F.4th 433, 444, 447 (6th Cir. 2021) (noting that there was no dispute that a witness's mental health records "would have impeached his general credibility," but denying defendant's *Brady* claim on other grounds); *Browning v. Trammell*, 717 F.3d 1092, 1106 (10th Cir. 2013) (concluding that suppressed mental-health records were material because they would have undermined the "credibility" of the "prosecution's indispensable witness"); *United States v. Kohring*, 637 F.3d 895, 910 (9th Cir. 2011) ("The government is generally under an obligation to disclose impeachment evidence that bears on the credibility of a witness, including evidence of poor mental and emotional health that may be provable on cross-examination."); *Smith*, 77 F.3d at 516 (noting that "[m]ental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' [*sic*] testimony" and that evidence regarding a witness's "chronic depression" could be

relevant impeachment material); *United States v. Vargas*, 18-cr-76 (PAC), 2018 WL 6061207, at *3 (S.D.N.Y. Nov. 20, 2018) (rejecting government's argument that a testifying cooperating witness's mental health, suicide attempt and relationship with defendant were "irrelevant and inadmissible" " because [n]one of the subjects have any bearing on [the witness's] character for truthfulness, and are entirely unrelated to the instant case," explaining that these areas "are relevant to her potential bias and motive for testifying at trial" and "bear[] directly on her 'character for truthfulness or untruthfulness'" (citing Fed. R. Evid. 608(b)(1) (other internal quotations and citations omitted); *cf. McCray v. Capra*, 45 F.4th 634, 642–43 (2d Cir. 2022) (finding no *Brady* violation in the withholding of certain information regarding victim's mental health condition since "a remarkable amount of information about the victim, including her history of hospitalizations for mental health episodes" was already disclosed and thus "[b]etween the sample provided to [defendant] and the victim's testimony in open court, [defendant] had ample material with which to impeach the victim's credibility at trial and more than sufficient information to prompt defense counsel to pursue the victim's mental health as a potential avenue for impeachment.").

To be sure, not every mental health issue experienced by government witnesses over the course of their lives triggers a *Brady*/*Giglio* disclosure obligation. The relevance and probative value of information about mental health issues may turn on the nature, time-frame, frequency, duration, severity, treatment and medication regimen accompanying the condition or episode, with the ultimate query focused on whether such mental health issues have a bearing on witnesses' clarity of recall and, consequently, both their competency and credibility. *See United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995) ("Evidence of a witness's psychological history may be admissible when it goes to her credibility. In assessing the probative value of

such evidence, the court should consider such factors as the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately." (internal quotation and citations omitted)).

Here, the Witness's mental condition, which appears to include episodes of depression and suicidal ideation, apparently stretches back to at least 2010 and, consequently, may be used to call into question the credibility of his testimony regarding his interactions with the defendant, at least until 2012 when the Witness began cooperating.  For instance, the Witness may not remember events as clearly at or before a period when he suffered a severe depressive episode, and therefore the information in the reports regarding the Witness's history and symptoms of mental health challenges may qualify as impeachment material.  *See Smith*, 77 F.3d at 516–17 & n.3 (noting that "the widely varying forms of depression and vast array of accompanying symptoms," including "delusions or hallucinations," made possible that the medical records at issue cast doubt on the witness's reliability).  While the government proffers that the witness suffered only two short episodes of depression and suicidal ideation, one over a decade ago and the second almost five years ago, the first episode occurred, after what was likely a traumatic kidnapping and hostage experience, during the course of the charged conspiracy about which the witness is being called to testify.  *See United States v. Peters*, 236 F. App'x 217, 221 (7th Cir. 2007) (noting "the unremarkable proposition that a jury should know about any mental health issues that would compromise a witness's ability to perceive and recall events at the time the crime occurred."); *United States v. Partin,* 493 F.2d 750, 762 (5th Cir. 1974) ("It is just as reasonable that a jury be informed of a witness's mental incapacity *at a time about which he*

*proposes to testify* as it would be for the jury to know that he then suffered an impairment of sight or hearing." (emphasis added)).  The second episode was sufficiently serious to require the intervention of local law enforcement and hospitalization, albeit "short," with no information provided as the Witness's continued need for treatment or medication or after-effects on the Witness's memory.  On this thin record, prudence militates in favor of disclosure to defendant. If the government's assessment proves correct that the information in the three law enforcement reports is of minimal relevance or not helpful to defendant, appropriate weight will be given to the testimony elicited from the Witness.

In sum, together, the full context of the benefits conferred on the Witness and the potential severity of his mental health condition both in 2010 and 2019, demand more than the government's proposed single sentence disclosure regarding the FBI's involvement in moving the Witness's car.  This information reveals a potential source of the Witness's biases and reflects on a factor that may affect his recall and credibility, which has a reasonable probability of affecting the outcome of this proceeding as the Witness stands to offer key testimony against defendant.  Thus, based on the descriptions provided by the government, the three withheld law enforcement reports qualify as *Giglio* material that must be disclosed to defendant.

Lastly, consideration of the government's instant motion has been conducted *ex parte* and under seal but, in light of the holding reached, the necessity of sealing is questionable. Therefore, the government is directed to show cause why its motion and this Memorandum Opinion and Order should not be promptly unsealed, in whole or in part.

### III.    CONCLUSION AND ORDER

Accordingly, it is hereby

**ORDERED** that the United States' *Ex Parte* Motion for a Protective Order, ECF No. 45, is **DENIED;** and it is further

**ORDERED** that, by June 23, 2023 at 2 PM, the government show cause why its *Ex Parte* Motion for a Protective Order, ECF No. 45, and this Memorandum Opinion and Order should not be unsealed, with or without redactions.

**SO ORDERED.**

Date: June 20, 2023

_____
BERYL A. HOWELL
U.S. District Court Judge